UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 21-1301(DSD/TNL)

Kyle-William Brenizer, et al.,

        Plaintiffs,

v.                              **ORDER**

The County of Sherburne,

        Defendant.


    Nicholas Ratkowski, Esq. and Ratkowski Law PLLC, 332 Minnesota Street, Suite W1610, St. Paul, MN 55101, counsel for plaintiffs.

    Stephanie A. Angolkar, Esq. and Iverson Reuvers, 9321 Ensign Avenue South, Bloomington, MN 55438, counsel for defendant.


    This matter is before the court upon the motion for summary judgment by defendant Sherburne County (County). Based on a review of the file, records, and proceedings herein, the court grants the motion.


**BACKGROUND**

    This action brought under 28 U.S.C. § 1983 arises out of claims by pre-trial detainees and convicted inmates housed at the Sherburne County Jail (Jail) that the County violated their constitutional rights by curtailing their ability to exercise during the COVID-19 pandemic. Plaintiffs specifically allege

that the County is liable under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978), for implementing unconstitutional policies and customs restricting their right to engage in the minimum amount of exercise guaranteed by the Constitution.

## I.   Jail Policies and Procedures

The following is a recitation of relevant Jail policies and procedures both before and during the COVID-19 pandemic.

### A.   Pre-Pandemic

According to the Jail's inmate handbook, inmates are "generally" permitted one hour of activity in one of the Jail's gyms five days per week, not including weekends.   Frank Decl. Ex. 2, at 29.[1]   The Jail has a total of four gyms, two of which are located in housing units.   Fritel Dep. at 22:23-23:1.   In order to participate in gym activities, inmates are required to sign-up in advance, complete a waiver, and agree to observe the gym program's set rules, instructions, and expected conduct.[2] Frank Decl. Ex. 2, at 29.   Gym recreation must be supervised by

---

[1]   Page numbers referenced in this order correspond to the ECF page numbers, which are located at the top of each page of the exhibit.

[2]   Inmates in segregation receive one hour of out-of-cell time, but are not permitted to use the gyms.   Frank Ex. 2, at 29.

one of the Jail's six recreation programmers.[3]  Id.; Fritel Dep. at 23:19-24:3, 25:16-18.   Approximately fifteen to eighteen inmates can use each gym at any given time.   Fritel Dep. at 23:11-14.

In addition to gym recreation, inmates are permitted to exercise by walking in their housing unit dayroom.  Frank Decl. Ex. 2, at 29; id. Ex. 1, at 3.  Inmates may also request a program to guide them through an in-cell workout.[4]  See id. Ex 8. In terms of other forms of recreation, inmates may watch television, read books and newspapers, play board games, and use Jail-provided tablets.  Id. Ex. 1, at 2, 29-30; Fritel Dep. at 16:7-11.  The Jail does not have an outdoor recreation facility. Frank Dep. at 54:12-14.

### B.  During the Pandemic

In March 2020, the world was faced with its first pandemic in 100 years.   Congregate settings such as jails faced unique challenges to prevent, or at least minimize, spread of the

---

[3]  Because recreation programmers are also tasked with other duties, for example, assisting with safety and security issues, there are times when there are not enough of them available to supervise gym activities.  Fritel Dep. at 24:7-25:2.  When such things happen, or programmers become ill, gym recreation may be suspended until a recreation programmer becomes available. Fritel Dep. at 24:7-26:25; Frank Decl. Ex. 4, at 2. Correctional officers are not permitted to cover for recreation programmers because they do not have the requisite training and education.  Fritel Dep. at 63:8-25; Frank Decl. Ex. 3, at 3, 5.

[4]  Cells in the Jail - which include a bed, toilet, and desk - range from 70 to 115 square feet.   Frank Dep. at 65:10-24; Fritel Dep. at 31:3-4; Frank Decl. Ex. 9.

COVID-19 virus to inmates and staff.  To do so, the Jail communicated regularly with the Minnesota Department of Corrections (DOC), the Minnesota Department of Health (MDH), and the Sherburne County Department of Health and Human Services (HHS) to determine how best to proceed.  See Frank Decl. Ex. 5. The Jail took "aggressive measures to decrease the risk of the introduction of the virus" from outside sources by decreasing the inmate population and imposing new quarantine and staffing procedures.  See id.; Frank Dep. at 90:7-19.  The Jail also undertook measures to try to prevent the spread of the virus inside its walls, including screening staff for COVID-19 symptoms, distributing personal protective equipment to staff and inmates, circulating fresh air, and mandating regular cleaning by inmates and professionals.  Frank Dep. at 90:7-19; Frank Ex. 6.  The Jail imposed a zoned work schedule to further reduce the risk of transmission by limiting personal interactions.  Frank Dep. at 90:17-24; Frank Decl. Ex. 5, at 5, 7.  Inmates were required to undertake COVID-19 screenings, which included daily temperature checks.  Frank Decl. Ex. 5, at 9.

Although the exact date is unclear, by April 1, 2020, the Jail had completely suspended gym recreation "until further notice."  Fritel Depo. 40:15-20; Frank Decl. Ex. 6, at 19.  The Jail asserts that the decision to do so followed advice from

HHS, MDH, and the Jail's medical provider.   Frank Decl. ¶ 3;
Frank Dep. at 31:15-36:4; Fritel Dep. at 18:4-19:13, 38:23-39:1,
49:42-50:7; Bostrom Decl. Ex. 3.   In particular, MDH counseled
against gym recreation due to its obvious risks, i.e., sweating
and breathing heavily in a confined space with others in close
proximity could lead to rapid transmission of the virus through
air droplets.   See Fritel Dep. at 19:14-20:7, 40:6-14; Frank
Dep. at 39:25-40:12, 47:4-12; Bostrom Decl. Ex. 3, at 6.

The Jail specifically relied on advice from the MDH COVID-
19 Congregate Living Settings Response Team (CCLSRT), which
included experts trained in managing pandemics in jails
settings.   Fritel Dep. at 28:7-11; Frank Dep. at 42:10-19.
According to the Jail, the CCLSRT's recommendations were the
"gold standard."  Fritel Dep. at 53:22-54:3.

Even though inmates were not permitted to exercise in the
gym, they were permitted to walk in the dayroom and exercise in
their cells, as was the case before the pandemic.   Id. at 15:14-
25, 31:3-11; Frank Dep. at 36:7-24, 58:10-20; Frank Ex. 6, at 3.
Inmates were prohibited from doing more than walking in the
dayroom as a form of exercise, however, because doing so would
result in heavy breathing that could cause the virus to spread
through air droplets.   Fritel Dep. at 40:8-14.   It should be
noted that exercise (other than walking) in the dayroom has
always been barred, as it created a risk of injury due to the

large number of inmates typically in the dayroom.  Frank Dep. at 28:12-16, 72:7-74:23.

In December 2020, when the State of Minnesota allowed public gyms to reopen, the Jail contacted the CCLSRT to determine if it could reopen its gyms for exercise.[5]  See Frank Decl. Ex. 10, at 2; Frank Dep. at 53:9-13.  The CCLSRT cautioned against reopening the gyms because the broader community policies did not apply to jails given their "increased risk of transmission and outbreaks."  Frank Decl. Ex. 10, at 2-3; Frank Dep. at 50:4-14, 53:3-13, 54:9-11.  The CCLSRT confirmed that other jails in Minnesota had not resumed gym programming and that MDH guidelines are designed to "limit as many sources of exposure as possible."  Frank Ex. 10, at 2.  The CCLSRT noted that if gym activities needed to be resumed "for the wellbeing of inmates," the gym capacity should be limited to no more than twenty-five percent while allowing for twelve feet of spacing between inmates.  Id. at 2-3.  Given the size of gyms at the Jail, the restrictions would allow only three to four inmates to use the gym at a given time.  Fritel Dep. at 23:11-15; Frank Dep. at 52:2-3.  According to the Jail, these restrictions would not allow the inmate population as a whole to meaningfully access the gyms.  Frank Dep. at 52:4-7, 53:19-22, 60:21-61:1.

_____

[5]  During the pandemic, the gyms were used for Zoom visits and daily movie viewing.  Fritel Dep. at 39:2-22.

Of particular concern to the Jail was the inequity in allowing some, but not all inmates to use the gym, which could lead to rioting.  Id. at 51:16-52:7, 59:16-60:3.  The Jail decided that it was best to maintain the gym closure policy for the time being.  Id. at 55:13-25, 57:6-59:2.

On June 3, 2021, the Jail inquired as to whether MDH had any updated guidelines for correctional facilities, as it was "anxious" to return to normal operations, but was informed that there were no updates.  Frank Decl. Ex. 11, at 2-3.  On June 24, 2021, the Jail asked HHS if it could resume gym recreation with specific vaccination and masking restrictions.  Id. at 4.  HHS noted that the Jail "has followed the 'gold standard' on all quarantine and mitigation guidelines and recommendations from MDH" and agreed that resuming gym operations with the proposed restrictions in place was "reasonable and appropriate."  Id.

The Jail ultimately reopened its gyms on July 6, 2021, offering an hour of access to inmates two times per week.  Frank Decl. ¶ 4; id. Ex. 12.  The Jail expanded gym access to three days per week per inmate on July 19 and four days per week on August 2, 2021.  Frank Decl. ¶¶ 5-6; id. Ex. 14, at 17.  The gyms remained open consistent with this schedule except when there were COVID-19 outbreaks at the Jail.  Frank Decl. ¶¶ 7, 12; Frank Dep. at 88:9-15.

When those outbreaks occurred, the Jail contacted the MDH and HHS to help prevent additional spread of the virus. Frank Dep. at 37:25-38:13. Consistent with MDH and HHS recommendations, the Jail imposed lock downs followed by quarantine schedules until it could perform widespread testing and ensure the safe resumption of routine operations. See Frank Decl. Exs. 15-18. Even during quarantines, inmates were permitted at least one hour of out-of-cell time per day in small groups. Frank Decl. Ex. 15, at 6, 11, 16; id. Ex. 16, at 24-25. There were several lockdown and quarantine periods during the pandemic: November 4, 2020, to November 26, 2020, Frank Decl. Ex. 15; March 8, 2021, to an unspecified date, id. Ex. 16, at 6, 8; September 7, 2021, to September 23, 2021, id. Ex. 17; and an unspecified date in December 2021 to January 14, 2022, id. Ex. 18.

## II. Plaintiffs

All plaintiffs resided at the Jail during some period of the pandemic and have now been released from custody or moved to other facilities.

### A.   Kyle-William Brenizer

Brenizer was housed at the Jail from August 20, 2020, to August 10, 2022. Frank Decl. Ex. 19; Brenizer Dep. at 6:18-7:12. On February 21, 2021, he filed a grievance complaining about the inability to exercise outside of his cell. Frank

8

Decl. Ex. 20, at 4.  Jail staff responded that the Jail was abiding by COVID-related policies for the safety of inmates and staff, and later explained more fully that:

> The Minnesota Department of Health instructed correctional facilities to avoid congregate recreational time for the safety of the inmates and staff.  Sherburne County follows recommendations of the MDH and the Department of Corrections is aware that correctional facilities, for the safety and security of the inmates and staff, have cancelled organized recreation in the facility.  This has not been lifted yet.

Id. at 5, 8.

As noted, during this period, inmates were permitted to walk in the day room and engage in in-cell exercise.  Brenizer testified that while the gyms were closed, he walked in the dayroom for an hour and a half and paced in his room for several hours each day.  Brenizer Dep. 17:5-13, 22:13-18, 23:23-24:1; see also Frank Decl. Ex. 45, at 12:50-13:30.  He would also do in-cell exercise "as often as possible," sometimes "several times a week."  Brenizer Dep. at 24:2-7.  He claims that the cells were mostly too small to meaningfully exercise in them, however.  Id. at 24:7-25:8.

When the gyms reopened on July 6, 2021, Brenizer used them less than half of the days they were available to him.  Frank Decl. Ex. 22.  He explained that it could be difficult to access the gym if he did not sign up early enough given space limitations.  Brenizer Dep. at 26:7-15.

Brenizer alleges that the inability to engage in out-of-cell exercise caused him to experience the following: weight gain, muscle atrophy, aches and pains in his right shoulder – related to a pre-existing injury – and legs, depression, lack of mental focus, anxiety, high blood pressure,[6] and acid reflux. Id. at 26:18-27:2; id. at 27:24-29:18.   At the time of his deposition, approximately one year after he left the Jail, he had lost two pounds and regained the muscles that had atrophied. Id. at 13:15-24, 38:20-39:16; Bostrom Decl. Ex. 5, at 21; Bostrom Decl. Ex. 6, at 51, 94.

**B.   Travis Fairbanks**

Fairbanks was confined in the Jail from March 4, 2021, to January 21, 2022.   Fairbanks Dep. at 6:17-7:5.   Fairbanks requested and received the in-cell workout soon after he arrived at the Jail. Id. at 15:19-21; Frank Decl. Ex. 24, at 2.   During the gym closures, he walked in the dayroom and did sit ups and other exercises in his cell.   Fairbanks Dep. at 14:21-16:15. According to his phone calls, Fairbanks admitted that he was able to work out intensely in his cell.   Frank Decl. Ex. 46, at 2:30-3:30 ("I worked out yesterday and my muscles are just sore now ... I did 90 squats, 25 incline push-ups, ... elbow and hold, ... where you put your legs up and your arms up and you

---

[6]   Brenizer's medical records do not support his claim that he developed high blood pressure during the gym closures.   See Bostrom Decl. Ex. 6, at 4, 12, 19, 27, 42, 51.

are laying on your back and hold that for 45 seconds four times, ... then ... with your feet on the wall ... d[id] handstand push-ups ... three sets of three."); see also id. Ex. 47, at 15:59-16:27 (describing in-cell work out).

On April 15, 2021, shortly after those phone conversations, Fairbanks submitted a grievance complaining about the lack of gym access.  Frank Decl. Ex. 25, at 2.  Jail staff responded that the gyms were closed due to COVID protocols and that Fairbanks could walk in the dayroom and exercise in his cell. Id. at 3.

When the gyms reopened, Fairbanks used them just fourteen times between July 6, 2021, and January 21, 2022.  Frank Decl. Ex. 26.  He explained that he would have attended more frequently, but was unable to do so due to high demand and limited space.  Fairbanks Dep. at 17:1-18:11.  Fairbanks claims that he experienced temporary muscle soreness due to the inability to exercise out of his cell and suffered from anxiety and depression for which he still takes an antidepressant.  Id. at 18-24-19:23.

**C.   Johnnie Haynes**

Haynes was housed at the Jail from October 3, 2019, to March 18, 2022.  Haynes Dep. at 6:2-7:14; Frank Decl. Ex. 33. Haynes spent a total of 153 days in disciplinary segregation during his stay at the Jail, during which he was ineligible to

use the gym.   See Frank Decl. Ex. 34; Haynes Dep. at 21:7-11, 31:12-17.

In 2019, Haynes used the gyms eleven times despite having sixty-six opportunities to do so.   Frank Decl. Ex. 35.   When the gyms were closed, Haynes walked in the dayroom.   Haynes Dep. at 17:12-13.   He claims that the cells were too small to engage in the exercises recommended in the in-cell workout.   Id. at 16:12-14.

Haynes filed a grievance on May 1, 2021, complaining about his inability to engage in out-of-cell exercise.   Frank Decl. Ex. 36, at 17.   Jail staff responded that "[r]ecreation will resume when we can safely do so, these measures are in place for the overall health and safety of the inmate population.   An in-cell workout plan is available upon request to Programs."   Id. at 18.   When the gyms reopened, Haynes went thirty-two out of 143 available days.   Haynes Dep. at 20:16-23.

Haynes asserts that he gained weight and now has high blood pressure due to his inability to effectively exercise.   Id. at 17:17-19:2, 22:15-23:4.   The medical records support a finding that Haynes struggled with his weight while at the Jail, even when the gyms reopened.   Bostrom Decl. Ex. 12, at 219, 271; Haynes Dep. at 18:3-5.   He also developed hypertension, which runs in his family.   Bostrom Ex. 12, at 30; Haynes Dep. at 19:3-

6.   Haynes's highest blood pressure readings occurred after the gyms reopened.  Bostrom Decl. Ex. 12, at 219, 258.

### D.   Montez Lee

Lee was housed at the Jail from February 24, 2021, to March 1, 2022.  Lee Dep. at 9:13-17.  When the gyms were closed, Lee walked in the dayroom and did the recommended in-cell workout. Id. at 13:23-15:5.  Lee did not file a grievance complaining about the exercise options available to him when the gyms were closed.  See Frank Decl. Ex. 30.

Once the gyms reopened, Lee went forty-eight times between July 2021 and his release from the Jail in March 2022.  Lee Dep. at 13:18-22; Frank Decl. Ex. 32.  Lee contends that the lack of out-of-cell exercise caused him to gain weight and suffer from unspecified muscle pain.  Lee Dep. at 16:2-6.  Lee's medical records show that he weighed 230 pounds shortly after he arrived at the Jail.  Bostrom Decl. Ex. 10, at 41.  He weighed 250 pounds on July 18, 2021, id. at 82, and was 236 pounds, when he left the Jail.  Id. at 131.  He was roughly the same weight at the time of his deposition.  Lee Dep. at 11:19-22.  Before his incarceration, Lee did not regularly exercise.  Lee Dep. at 13:5-11.

### E.   Steven Lincoln

Lincoln was housed at the Jail from February 14, 2020, to June 29, 2022.  Lincoln Dep. at 5:4-18, 7:23-8:1; Frank Decl.

Ex. 41.   Lincoln did not use the gym in the month before they were closed due to COVID-19.   Frank Decl. Ex. 43; Lincoln Dep. at 9:10-18.   After the COVID protocols were in place, Lincoln walked in the dayroom for exercise.   Lincoln Dep. at 10:6-14. When the gyms reopened, Lincoln signed up only five out of 217 available days.   See Frank Decl. Ex. 43.

Lincoln states that the lack of exercise caused him to experience increased back pain – he has hereditary degenerative disc disease which predated his time at the Jail – and to develop high cholesterol – also a heredity condition.   Lincoln Dep. at 15:5-9; 11:14-21; Bostrom Decl. Ex. 17, at 120, 168.   He walked in the day room to help his back and attended physical therapy.   Bostrom Decl. Ex. 17, at 70-72, 91, 116; Lincoln Dep. at 12:1-15.   Lincoln was prescribed medication for his high cholesterol, which he refused to take.   Bostrom Decl. Ex. 17, at 195, 197, 203.   He later agreed to take Niacin, which helped lower his cholesterol.   Id. at 81, 87, 197, 226-28.

Lincoln did not file any grievances regarding the exercise restrictions in place during his stay at the Jail.   See Frank Decl. Ex. 42.

**F.   Abdiweli Jama**

Jama was incarcerated at the Jail from February 4, 2021, to May 12, 2022.   Jama Dep. at 5:4-25, 8:14-17; Frank Decl. Ex. 37. Jama was placed in medical segregation for the first two months

14

he was at the Jail due to a fractured right arm.   Frank Decl.
Ex. 39.   After leaving segregation, Jama exercised by walking in
the day room.   Jama Dep. at 14:2-10, 16:19-2, 22:3-6.   He was
concerned that more vigorous exercise could impede his recovery.
Id. at 21:7-10.   Once the gyms were reopened, Jama went
approximately one-third of available days.   Frank Decl. Ex. 40.

Jama contends that the out-of-cell exercise restrictions
caused him to gain weight, feel fatigued, and develop a vitamin
D deficiency and high cholesterol.   Jama Dep. at 19:16-20.
Medical records show that Jama gained weight throughout his stay
at the Jail, including after the gyms reopened.   Id. at 10:22-
11:12; Bostrom Decl. Ex. 14, at 27.   They also show that he
reported being fatigued before he came to the Jail.   Bostrom
Decl. Ex. 15, at 3.   It appears that Jama did suffer briefly
from vitamin D deficiency and that his cholesterol levels were
borderline.   Id. Ex. 14, at 92, 96.   He was prescribed
medication help lower his levels.   Id.

Jama did not file any grievances regarding the exercise
restrictions in place.   See Frank Decl. Ex. 38.

**III. Procedural Posture**

Plaintiffs filed this suit pro se on May 28, 2021, claiming
that they were deprived of their constitutional right to
exercise.   See ECF No. 1.   Plaintiffs later secured counsel.   On
September 20, 2022, plaintiffs filed a second amended class

action complaint against the County alleging that the Jail's policies and customs limiting out-of-cell exercise during the COVID-19 pandemic unlawfully deprived them of their right to sufficient exercise under the Eighth and Fourteenth Amendments, and in violation of Monell.[7]  See ECF No. 58.  Plaintiffs allege that the deprivation of their constitutional rights caused them to suffer from weight gain or weight loss, mental and emotional stress, muscle atrophy, and/or body aches and pains, among other ailments.  See id. ¶ 112.  Plaintiffs seek damages and injunctive relief requiring the Jail to allow inmates to exercise at least seven hours per week, subject to reasonable exceptions to be determined by the court.  See id. at 30-31.

On March 23, 2023, the court denied plaintiffs' motion to certify the case as a class action.  ECF No. 88.  The County now moves for summary judgment.

## DISCUSSION

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322

---

[7]   In this context, the Eighth Amendment applies to inmates convicted of a crime, whereas the Fourteenth Amendment applies to pre-trial detainees.

(1986).  A fact is material only when its resolution affects the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  <u>See</u> <u>id.</u> at 252.  On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party.  <u>Id.</u> at 255.

The nonmoving party, however, may not rest on mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324.  A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. <u>Celotex</u>, 477 U.S. at 322-23.

## II.  **Prison Litigation Reform Act (PLRA)**

The County first argues that plaintiffs' claim for monetary relief us barred under the PLRA because they have not alleged sufficient physical injury caused by the gym closures.  The PLRA provides that "[n]o federal action may be brought by a prisoner confined in jail, prison or other correctional facility for

17

mental or emotional injury suffered while in custody, without a prior showing of physical injury." 42 U.S.C. § 1997e(e). "[Section] 1997e(e) is merely a limitation on damages, not an element of [a] § 1983 lawsuit." Kahle v. Leonard, 563 F.3d 736, 742 (8th Cir. 2009) (quotation omitted).

Plaintiffs maintain that they have suffered both physical injuries and emotional distress as a result of the County's COVID-related gym closures. The County argues that plaintiff's alleged injuries lack the requisite causal connection to the alleged unconstitutional conduct. According to plaintiffs, no such causal connection is required given the Eighth Circuit Court of Appeals' decision in McAdoo v. Martin, 899 F.3d 521, 526 (2018). In McAdoo, the court held as follows:

> [T]he PLRA's gatekeeper function against frivolous suits does not require a prison inmate to make a showing of a physical injury caused by an unconstitutional act, [but instead] requires a showing of harm caused by some unconstitutional conduct that amounted to deliberate indifference and an accompanying showing of physical injury.

Id. Plaintiffs contend that this language means that there need be no connection whatsoever between the physical injury and the unconstitutional act, such that their preexisting health issues and injuries which are totally untethered to the County's policies and practices at issue, suffice to establish the

required injury.[8]  Although that certainly may be true when there is a claim for deliberate indifference to medical needs arising from preexisting injuries and illnesses, it is not the case when such deliberate indifference is not alleged.  See White v. United States, No. 20-cv-141, 2020 WL 6834206, at *5 (W.D. Okla. Sept. 25, 2020) (holding that the absence of a claim for deliberate indifference to preexisting medical needs, a plaintiff must show that defendant caused the physical injury). Indeed, were the court to adopt plaintiffs' interpretation of McAdoo, § 1997e(e)'s physical injury requirement would be meaningless, as it would allow a prisoner with any kind of preexisting injury or illness to recover damages for a defendant's wholly unrelated conduct.  Here, although plaintiffs generally allege deliberate indifference with respect to the gym policies in their most recent complaint, they do not allege that the County acted with deliberate indifference in treating or responding to plaintiffs' preexisting or unrelated illnesses or injuries.  See ECF No. 58 ¶¶ 148-50.  Given this finding, the court will focus on the injuries plaintiffs argue were caused by the gym closures at issue.

As to those injuries, the County argues that they are de minimis and therefore preclude monetary damages.  Although "[n]o

---

[8]  See ECF No. 110, at 3-17 (listing plaintiffs' various physical ailments that preexisted or are unrelated to the policies alleged to be unconstitutional).

clear line divides de minimis injuries from others," Irving v. Dormire, 519 F.3d 441, 448 (8th Cir. 2008), courts have concluded that injuries like those sustained by plaintiffs are in fact de minimis.

Plaintiffs collectively argue that they suffered from the following as a result of the County's COVID-19 gym policies: weight gain, muscle atrophy, aches and pains, depression, lack of mental focus, anxiety, high blood pressure, acid reflux, hypertension, fatigue, vitamin D deficiency, and high cholesterol. These conditions do not constitute more than a de minimis injuries, however. See Chatham v. Adcock, 334 Fed. Appx. 281, 284 (11th Cir. 2009)(anxiety and increase in blood pressure insufficient to satisfy the PLRA's physical injury requirement); Alexander v. Tippah County, Miss., 351 F.3d 626, 631-32 (5th Cir. 2003)(emotional and mental injuries do not satisfy physical injury requirement); Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir. 2003)(temporary aches are de minimis injuries); Pelullo v. Philadelphia Det. Ctr. Philadelphia, No. 13-cv-5165, 2015 WL 5316507, at *4 n.5 (E.D. Pa. Sept. 11, 2015)(weight gain not a physical injury under PLRA); Grainger v. Fed. Bureau of Prisons, No. 08-cv-387, 2009 WL 47127, *3 (S.D. Tx. Jan. 6, 2009)(anxiety, stress, emotional distress, loss of appetite, headaches and sleeplessness do not constitute more than a de minimis injury); May v. Donneli, No. 9:06-cv-437, 2009

WL 3049613, *3 (N.D.N.Y. Sept. 18, 2009)(weight loss and an increase in blood pressure insufficient); Adeleke v. Fleckenstein, No. 1:08-cv-055, 2009 WL 10705197, at *6 (N.D. Tex. July 2009) (heartburn, neck pains and high blood pressure insufficient to establish physical injury under PLRA); Todd v. Graves, 217 F. Supp. 2d 958, 960 (S.D. Ia. 2002) (stress, hypertension, insomnia, dizziness, and loss of appetite not physical injury under PLRA).

Plaintiffs have failed to meet the injury requirement of the PLRA and therefore are not entitled to compensatory damages. Even if plaintiffs' injuries were more than de minimis and causally related to the policies at issue, however, their claims still fail.

## III. Injunctive Relief

Because plaintiffs are not entitled to monetary damages, the court must consider whether they may secure injunctive and declaratory relief should they prevail. The court finds that they lack standing to do so. It is well established that "a prisoner's claim for injunctive [and declaratory] relief to improve prison conditions is moot if he or she is no longer subject to those conditions." Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985). As none of the plaintiffs remain in the Jail, they are no longer subject to the policies and customs at

issue and their claims for injunctive and declaratory relief are moot.

The court is wholly unpersuaded by plaintiffs' argument that the case is "capable of repetition but evading review." ECF No. 110, at 62. First, their claims are also likely moot given that the pandemic is over and the policies and customs complained of are no longer in place. Second, there is no evidence that plaintiffs themselves could be subject to similar policies and customs in the future.

On this basis alone, plaintiffs' claims are untenable given their inability to recover any form of relief requested. The court will nevertheless consider the other bases for summary judgment.

## IV. Exhaustion

The County argues that plaintiffs' claims must be dismissed because they failed to exhaust administrative remedies. The PLRA states that "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a). This provision is designed to "reduce the quantity and improve the quality of prisoner suits." Porter v. Nussle, 534 U.S. 516, 524 (2002).

Exhaustion is required even if "the inmate subjectively believe[s] that there [is] no point in his pursuing administrative remedies." Porter v. Sturm, 781 F.3d 448, 451 (8th Cir. 2015) (alteration in original) (quoting Lyon Vande Krol, 305 F.3d 806, 809 (8th Cir. 2002)). An inmate satisfies the PLRA when the inmate "pursu[es] the prison grievance process to its final stage to an adverse decision on the merits." Id. at 452 (internal quotation marks and citation omitted).

Although mandatory, exhaustion "hinges" on the availability of administrative remedies. Ross v. Blake, 578 U.S. 632, 642 (2016). In other words, if a grievance procedure is "not capable of use to obtain relief," exhaustion is not required. Id. The United States Supreme Court has identified three instances in which a grievance procedure is not capable of use: (1) when it "operates as a simple dead end" because officers are "unable or consistently unwilling to provide any relief;" (2) when it is "so opaque that it becomes, practically speaking, incapable of use;" and (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 643-44.

The record here establishes that during the first period of gym closures – between March 19, 2020, to July 5, 2021 - only Brenizer, Fairbanks, and Haynes filed grievances complaining

23

about the lack of out-of-cell exercise.  The Jail denied the grievances citing the COVID-19 pandemic and inmate and staff safety.  It is undisputed that none of those plaintiffs appealed the denial of relief despite having the ability and obligation to do so.  None of the plaintiffs filed grievances relating to the later gym closures - July 6, 2021, to present.

Plaintiffs argue that they were excused from the exhaustion requirement because the process was a dead end, the grievance policy was too confusing to follow, and officers retaliated against them for filing grievances.  The court is unpersuaded that any of the exceptions to exhaustion apply here.

First, a grievance process is not a dead end simply because the relief requested was denied.  "[A]s long as 'the administrative process has authority to take some action in response to a complaint, [even if] not the remedial action an inmate demands,' administrative remedies are 'available.'" Muhammad v. Mayfield, 933 F.3d 993, 1000 (8th Cir. 2019) (quoting Booth v. Churner, 532 U.S. 731, 737-38 (2001)). Plaintiffs argue that the officers responding to grievances did not have the authority to change the policies at issue, which made the grievance process unavailable.  But this argument ignores plaintiffs right – and pre-suit obligation - to appeal the decision to a higher level.

Indeed, the purpose of the process is to provide an avenue for corrective action at the institutional level, to filter out frivolous claims, and to concretely define the dispute should it result in a federal claim. Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003).  It is not outcome driven, but rather process driven.  In this case, there is no dispute that the process was in place and available to plaintiffs.

The court is also unpersuaded that the grievance policy was opaque because the COVID-19 policies were ever-changing. Plaintiffs do not credibly contend that the grievance policy itself was too confusing to follow, which is the focus of the court's inquiry.

There is also no plausible evidence that officers retaliated against inmates for filing grievances.  Haynes and Fairbanks filed declarations in which they suggest that filing grievances would lead to problems with jail staff.  See Haynes Decl. ¶¶ 4-9, 14; Livingston Decl. ¶¶ 13, 19.  Plaintiffs do not cite to any other evidence of such alleged retaliation.

When considering a motion for summary judgment, the court must reject all conclusory and self-serving testimony unsupported by additional facts.  See Ballard v. Heineman, 548 F.3d 1132, 1136 (8th Cir. 2008) (quoting Allen v. Entergy Corp., 181 F.3d 902, 906 (8th Cir. 1999)) ("[C]onclusory affidavits devoid of specific factual allegations rebutting the moving

party's evidence cannot defeat a summary judgment motion.");
Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006) ("[A]
properly supported motion for summary judgment is not defeated
by self-serving affidavits."). Given the self-serving nature of
the declarations filed here, and the lack of corroborating
evidence, the court cannot conclude that there is a genuine
issue of material fact on this point.

As a result, the court finds that none of the plaintiffs
exhausted their administrative remedies before filing this case.
Brenizer, Fairbanks, and Haynes filed grievances as to the first
round of gym closures, but did not appeal the denials. They did
not challenge the later COVID-related gym closures. And Lee,
Jama, and Lincoln never filed grievances relating to the subject
of this suit. The case may be dismissed on this basis alone.

**V.   Deliberate Indifference**

Even if plaintiffs did exhaust their administrative
remedies, their claims, which relate to the conditions of their
confinement, fail on the merits. The constitutional analysis
differs depending on whether the individual is a pretrial
detainee or a convicted inmate. See Stearns v. Inmate Servs.
Corp., 957 F.3d 902, 906 (8th Cir. 2020); see also Bell v.
Wolfish, 441 U.S. 520, 535 (1979). For convicted inmates,
"[t]he Eighth Amendment's prohibition against cruel and unusual
punishment imposes duties on [prison] officials, who must

provide humane conditions of confinement[.]" _Shipp v. Murphy_, 9 F.4th 694, 703 (8th Cir. 2021) (quotation omitted and alteration in original).   The Fourteenth Amendment provides that a "pretrial detainee not be punished.'" _Walton v. Dawson_, 752 F.3d 1109, 1117 (8th Cir. 2014) (quoting _Bell_, 441 U.S. at 535).

"[A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." _Mettler v. Whitledge_, 165 F.3d 1197, 1204 (8th Cir.1999) (citing _Monell_, 436 U.S. at 694).   To establish municipal liability under § 1983 a plaintiff must demonstrate that a municipal policy or custom was the "moving force [behind] the constitutional violation." _Monell_, 436 U.S. at 694. The terms "policy" and "custom" are not interchangeable.   _See Mettler_, 165 F.3d at 1204.   In this case, plaintiffs raise both policy and custom claims.

### A.   Policy Claim

As the court understands it, plaintiffs' policy claim focuses on the Jail's COVID-related gym-closures from March 2020 to August 5, 2021.   They argue that the County violated their Constitutional right to out-of-cell exercise by closing the gyms and permitting only walking in the dayroom and in-cell exercise.

For there to be a _Monell_ violation, the policy in question, must be the "moving force [behind] the constitutional

violation." Mettler, 165 F.3d at 1204 (quoting Monell, 436 U.S. at 694). There is no question that the Jail's COVID-related policies are the basis for the constitutional violations alleged, so the court will turn directly to whether the policies underlying the gym closures between March 19, 2020, and July 5, 2021, were unconstitutional.

To establish unconstitutional policies in this context, plaintiffs must show that the County was deliberately indifferent to their exercise needs. Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992). The court considers the following factors in assessing the alleged indifference: (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement. Id.

Analysis of the Wishon factors shows that the County was not deliberately indifferent to plaintiffs' exercise needs. First, the record establishes that plaintiffs generally were permitted to be outside of their cells for several hours per day when not in lockdown or segregation. When outside of their cells, plaintiffs were permitted to walk in the dayroom as a form of exercise and to engage in other recreational activities. Second, inmates were encouraged to exercise in their cells during the gym closures and were provided in-cell workout guides. Third, although plaintiffs argue that the cells were

too small to engage in in-cell exercise, photos of the cells establish the contrary.  See ECF No. 68, at 10-25.  Further, two of the plaintiffs admitted in prison phone calls to exercising in their cells.  Fourth, even though the duration of confinement differed for each plaintiff, each was there during the relevant periods and each was permitted to walk in the day room and to exercise in his cell when the gyms were closed.  Under these circumstances, the court cannot conclude that the County's COVID-related gym closures were inhumane or tantamount to punishment.

Furthermore, of significance in this context, the right of inmates to out-of-cell exercise must be balanced with the Jail's "legitimate interests" in "preserv[ing] internal order and discipline and ... maintain[ing] institutional security."  Bell, 441 U.S. at 547.  Jails have "substantial discretion to devise reasonable solutions to the problems they face[.]"  Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318, 326 (2012).  The court "declines to second-guess decisions made by the [County] to try to minimize the spread of COVID-19 during an unprecedented pandemic."  Biron v. Carvajal, No. 20-cv-2110, 2021 WL 3047250, at *34 n. 38 (D. Minn. July 20, 2021).  Indeed, as other courts have recognized, "severely restricting the movement of inmates and closing the gym, while inconvenient and uncomfortable, considering the ongoing pandemic, is not

unreasonable or excessive in relation to [the jail's] stated purpose of preventing a COVID-19 outbreak." Vieth v. Dobson, No. 20-CV-1615-BHL, 2020 WL 7427050, at *2 (E.D. Wis. Dec. 18, 2020).

Here, the County, in conjunction with MDH, HHS, and CCLSRT, devised policies designed to maintain prisoner and staff safety during the unexpected pandemic.  There is no evidence in the record to support a finding that the policies born of the pandemic were anything other than reasonable.  The policies were reasonable in light of the recommendations provided by the entities tasked with ensuring public health and safety,[9] and as a matter of common sense.  As a result, there is no genuine issue of material fact precluding summary judgment.

**B.  Custom Claim**

Although based on custom rather than policy, plaintiffs' remaining claim fails for the same reason discussed above.  In short, plaintiffs have failed to establish a constitutional violation and therefore cannot meet their obligation to establish a custom claim under Monell.

+

---

[9]  Plaintiffs argue that the recommendations provided by MDH, HHS, and CCLSRT are not admissible because they constitute hearsay.  The court disagrees.  As noted in the background section, the record includes emails directly from outside agencies tasked with helping the Jail determine COVID policies.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED that:**

1.    The motion for summary judgment [ECF No. 95] is granted; and

2.    The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: October 31, 2023

s/David S. Doty
David S. Doty, Judge
United States District Court
